## Banks v. Shearer et al.

*Culbertson & Stuckenrath*, for plaintiff.

*Andrew Banks* and *Samuel S. Laucks*, for defendants.

BARNETT, P. J., October 28, 1935.—This is a proceeding in equity to restrain the Commissioners of Juniata County from printing on the ballot for the election to be held in the Borough of Mifflintown on November 5, 1935, a form for a referendum, as authorized by the Act of July 18, 1935, P. L. 1217, upon the question of granting retail licenses for the sale of malt and brewed beverages in the borough. The case was heard upon the bill, to which no answer was filed, and certain facts agreed upon by counsel.

### Findings of fact

1. The plaintiff, together with his brother, Hugh M. Banks, is the holder of a license for the retail sale of malt and brewed beverages in the Borough of Mifflintown at the Hotel William Banks, owned by the plaintiff.

2. [The defendants are Charles W. Shearer, John H. Hostetler and N. W. McCahan, county commissioners of Juniata County, Chester McCormick, president, and Samuel L. Rapp, secretary, of the Borough Council of the Borough of Mifflintown, and Henrietta Baldwin, Alice S. Adams, and Jeanne Adams, individually and representing all other persons signing a petition for a referendum on the granting of licenses for the sale of malt and brewed beverages in the Borough of Mifflintown, Pa.]

3. The Act of 1935, supra, provides in section 31:

"Local Option.—In any municipality or township an election may be held, but not oftener than once in four

years, on the date of any municipal election, to determine the will of the electors with respect to the granting of licenses to retail dispensers under the provisions of this act. Whenever electors equal to at least ten per centum of the highest vote cast for any office in the municipality or township at the last preceding general election shall petition the corporate authorities of the municipality or township for a referendum on the question of granting such licenses, the said corporate authorities shall cause a question to be submitted at the municipal election occurring at least sixty days thereafter, by certifying a resolution, duly adopted, to the county commissioners for submission of such question, on the ballot or on voting machines, at such election in the manner provided by the election laws of the Commonwealth."

4. The Borough Council of the Borough of Mifflintown has certified to the county commissioners a resolution reciting that a petition of electors of the borough for a referendum on the question of granting licenses for the sale of malt or brewed beverages has been presented to the council, and that the petition bears the names of electors in number equal to at least 10 percent of the highest vote cast for any office in the borough at the last preceding election.

5. The county commissioners have authorized the printing of ballots and purpose to submit to the electors of the borough a referendum in the form approved by the Act of July 18, 1935, for the election to be held on Tuesday, November 5, 1935.

6. The petition bears the names of 49 persons, presumably qualified electors of the borough.

7. At the last preceding general election, held November 6, 1934, the highest vote cast in the borough for any office was 573 votes, cast for the office of United States senator.

8. The highest vote cast in the borough at the same election for any individual candidate for any office was

332 votes, cast for William A. Schnader, candidate for the office of Governor of Pennsylvania.

## Discussion

The question to be determined is, what did the legislature mean by the phrase "the highest vote cast for any office". We have no doubt that it meant precisely what it clearly says. It is argued for the defendants, however, that the legislature intended to say "the highest vote cast for any individual candidate for any office", and that the phrase should be so interpreted. The fatal objection to this argument is that the language of the act is so plain as not to require or admit interpretation. The late Judge Endlich in his Interpretation of Statutes, section 4, said:

"When, indeed, the language is not only plain but admits of but one meaning, the task of interpretation can hardly be said to arise. . . . It is not allowable, says Vattel, to interpret what has no need of interpretation. . . . The Legislature must be intended to mean what it has plainly expressed, and consequently there is no room for construction." And again, in section 72: "If the language, [read in the order of its clauses, presents no ambiguity and] admits of no doubt or secondary meaning, it is simply to be obeyed, without more".

We should consider the foregoing sufficient for the disposition of the case but for the argument that the meaning of the word "office" is ambiguous and does admit of doubt, and the statement that as used in the statute it has been held, in Commonwealth, ex rel., v. Bush et al., 22 D. & C. 105, to have the significance which counsel for the defendants now contends it should be given. With the highest respect for the learned judge who wrote the opinion in that case, we cannot agree with its conclusion, the error of which seems to be demonstrated by the opinion itself. Again quoting Judge Endlich, section 2:

"The first and most elementary rule of construction is, that it is to be assumed that the words and phrases are used in their technical meaning if they have acquired one,

and in their popular meaning if they have not, and that the phrases and sentences are to be construed according to the rules of grammar; and from this presumption it is not allowable to depart, unless adequate grounds are found, either in the context or in the consequences which would result from the literal interpretation, for concluding that that interpretation does not give the real intention of the Legislature. [It is said that the fixed technical meaning of a word must be given to it when used in a statute, unless the context shows an intention to use it in a different sense; whilst, under a similar limitation words of common use are to be understood in their natural, plain, ordinary and genuine signification as applied to the subject matter of the enactment.]"

No attempt is made in the opinion, or by argument of counsel, to demonstrate that the context, or any supposed consequences of literal interpretation, require or justify the straining of the word "office" from its generally accepted meaning. The alleged ambiguity, according to the opinion and as urged by defendants' counsel, is found in the word itself. If it be assumed that the word has a technical meaning, that meaning has been fixed by text writers and court decisions without number. The two classical commentators on the common law define it as follows: ". . . right to exercise a public or private employment, and to take the fees and emoluments thereunto belonging . . . whether public, as those of magistrates; or private, as of bailiffs, receivers": 2 Lewis' Bl. Com. 36. "Offices are another species of incorporeal hereditaments, and they consist in a right, and correspondent duty to execute a public or private trust, and to take the emoluments belonging to it": 3 Kent's Com. 362.

Every one of the scores of definitions collected in the First and Second Series of Words and Phrases from decisions of courts all over the country, from the Federal Supreme Court down, is but a paraphrase or amplification of these two definitions. The opinion in the Bush case quotes definitions from 46 C. P. 921, 62 Pa. 343, 349,

101 Pa. Superior Ct. 412, 417, and 110 Pa. Superior Ct. 295, 299, all of which are to the same effect as those above indicated. Certainly they do not support the conclusion that "office" means "candidate for office". But, the opinion continues: "In the Oxford Dictionary, among the definitions given for the word 'office', we find that the term may be used in a personified sense as denoting an office holder." This definition is not quoted in the opinion, but doubtless it is the following: "A place for the transaction of private or public business of some kind; often including the 'staff' by which the business is conducted, or denominating the department of which they are officers. Applied to the room or department in which the clerkly work of an industrial or other establishment is done, a counting-house; also to that in which the business of any particular department of the operations of a large concern is conducted, as the booking-office".

A similar definition found in the Century Dictionary reads: "The persons collectively who transact business in an office: often applied specifically to an insurance company: as, a fire-office." So, when the British Foreign Office states, or the Quai d'Orsay announces, we understand that not the four walls of a building, but the functionaries housed therein are vocal. In this exceptional sense the word may imply the officeholder but cannot be thought to mean one who merely aspires to hold the office. The word has never been construed in this sense by any court, so far as we have been able to discover. It is not the technical meaning of the word, if it can be said to have a technical meaning, and certainly is not the ordinary, popular meaning, which the legislature must be presumed to have intended, in the absence of a technical meaning. A candidate, in the popular phrase, is one who "runs for office", but the public never confuses the runner with the goal. Few writers, perhaps, have been more prone to employ words in an unusual sense than was Shakespeare, yet of the 153 times he used the word "office", according to Bartlett, only once did he use it in

a sense differing from the popularly ascribed meaning. When Hamlet resents "the insolence of office" he means those in places of authority, not the places in which they exercise their authority.

The opinion implies that to hold "office" to mean "office", rather than "candidate for office", it is necessary to read into the statute the word "total" before the word "vote". We can see no such necessity. In the absence of any language to suggest division or diminution of the vote, the word must be understood in its absolute sense, implying nothing more or less than or different from the aggregate vote cast for the office. To avoid the imagined necessity for the interpolation of the word "total" before the word "vote", the opinion actually reads into the statute the words "any individual candidate for" before the words "any office".

In the Bush case there was under consideration section 502 of the Liquor Control Act of November 29, 1933, P. L. 15, of which section the thirty-first section of the Act of 1935, except for the change of a word or two not here relevant, is a verbatim copy. The opinion seems to be based largely upon a provision of the Liquor Control Act of November 29, 1933, P. L. 15, section 3, that that act "shall be liberally construed for the accomplishment of [its] purpose." If it be granted that this provision applies, at least in spirit, to the malt beverage acts of 1933-35, yet the requirement of liberal construction should not be made the excuse for licentious construction. And there is no necessity for an extraordinary interpretation of the word "office" "for the accomplishment of the purpose" of either of the malt beverage acts. On the contrary, such an interpretation would actually defeat their purpose to fix, as nearly as may be, a uniform and accurate norm upon which to compute the minimum number of signers required upon a petition. The intention, in respect of the referendum, is that an election on such question is to be held only when a substantial number of the voting populace demand it. This number was

fixed by the legislature as "at least ten per centum of the highest vote cast for any office in the municipality or township at the last preceding general election." To succeed in a referendum the petitioners must command a majority, not of the vote cast for any candidate at such election, but of all votes upon the question of the referendum. If they have any expectation of so doing they should be able to secure signers in the required number which would be approximately twenty percent of the minimum vote required to carry the referendum. There should seem to be nothing unreasonable in the requirement of the act and no reason for a strained construction of it to permit an election when its provisions have not been complied with.

The opinion in the Bush case asserts that: "Had it been its intention to combine all votes cast for a given office, the legislature would have inserted the word 'total' or 'entire'. If the legislature so intended, it should have used definite language as in other similar statutes." As we have already opined, the word "vote" can only mean total, entire or aggregate vote, in the absence of any language tending in any way to qualify it. With much greater force may it be said that if the legislature had intended the "vote for any office", to mean vote for any individual candidate for any office, it should have said precisely that, as it did in the Act of July 2, 1935, P. L. 599, providing for referenda on the question of Sunday moving picture exhibitions, which authorized a referendum "upon petition to county commissioners by electors equal to at least five per centum (5%) of the highest vote cast for any candidate in the municipality at the last preceding general election".

### Conclusions of law

1. The words of the Act of July 18, 1935, P. L. 1217, "highest vote cast for any office" mean the highest aggregate vote for all candidates for any office, and not the highest vote for any individual candidate for any office.

2. The petition in question bore the signatures of less than 10 percent of the highest vote cast in the Borough of Mifflintown for any office at the last preceding general election.

3. The petition failed to meet the requirement of the Act of 1935.

4. The County Commissioners of the County of Juniata should be enjoined and restrained from printing upon the ballot and submitting to the electors of the Borough of Mifflintown a form for a referendum under the provisions of the Act of 1935, supra, for the election to be held Tuesday, November 5, 1935.

5. The costs of this proceeding should be paid by the County of Juniata.

### Decree

And now, October 28, 1935, it is ordered, adjudged and decreed that the County Commissioners of the County of Juniata be and they hereby are enjoined and restrained from printing upon the ballot and submitting to the electors of the Borough of Mifflintown a form for a referendum under the provisions of the Act of July 18, 1935, P. L. 1217, for the election to be held on Tuesday, November 5, 1935; and that the costs of this proceeding be paid by the County of Juniata.

The prothonotary will enter this decree nisi, it to become final unless exceptions shall be filed hereto within 10 days from November 15, 1935.

From J. Howard Neely, Mifflintown.